UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRANTON NOOJIN,

Plaintiff,

v.                                                CAUSE NO. 3:24-CV-895-GSL-JEM

BRIAN ENGLISH, et al.,

Defendants.

<u>OPINION AND ORDER</u>

Branton Noojin, a prisoner without a lawyer, filed a motion to amend his amended complaint. ECF 16. At this stage, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). When justice requires it, leave should be freely given. *Id.* Noojin has attached a proposed second amended complaint to his motion. In the interests of justice, the court will grant the motion and proceed to analyze his second amended complaint.

Under 28 U.S.C. § 1915A, the court must screen a prisoner's complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because Noojin is proceeding without counsel, his allegations must be given liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Noojin's second amended complaint is thirty pages long and contains a variety of tangentially related claims. He was reclassified to administrative restrictive status housing (ARSH) at the Miami Correctional Facility (MCF) on November 21, 2023, because he "posed a threat to life, self, staff, other offenders, or property." ECF 16-1 at 3. He complains about various conditions in ARSH—which will be discussed in detail below—and asserts that his Fourteenth and Eighth Amendment rights have been violated. He also claims he was retaliated against. Noojin has sued Warden Brian English, Deputy Warden of Operations Smith, Grievance Specialist Michael Gapski, Major Robert Bennett, John Zillner, the CEO of Aramark Food Service Corporation, and Ms. Montez, the Aramark Food Service Supervisor. He seeks $300,000 in punitive and compensatory damages against all defendants. He also seeks to have Grievance Specialist Gapski "fired for malicious conduct" and Ms. Montez fired for "breach of contract, dereliction of duty, professional misconduct, deliberate indifference, and malice." *Id*. at 30.

*Fourteenth Amendment - Due Process*

The court will address Noojin's due process claims first because they seem to make up the bulk of his complaint—he is unhappy with his classification designation to ARSH and takes issue with the conditions there. The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property,

without due process of law . . ..” U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes an “atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.” *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In other words, “disciplinary segregation *can* trigger due process protections depending on the duration and conditions of segregation.” *Jackson v. Anastasio*, 150 F.4th 851, 858 (7th Cir. 2025) (quoting *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) (emphasis in original)). Both the duration and the severity of the conditions themselves must be considered when determining whether the prisoner’s placement in solitary confinement triggers due process protections—the length of time must be “substantial” and the conditions must be “unusually harsh.” *Id.*

Similarly, while inmates don’t generally have a liberty interest in “avoiding transfer to *discretionary* segregation—that is, segregation imposed for administrative, protective, or investigative purposes[,]” *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (emphasis added) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005), the same analysis applies with regard to duration and the harshness of the conditions. *See e.g., Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (“Prisoners do not have a constitutional right to remain in the general population, . . . but both the duration *and* the conditions of the segregation must be considered in determining whether due process is implicated.”) (internal quotation marks, parenthesis, and citations omitted; emphasis in original); *Marion*, 559 F.3d at 697-98 & nn.2–3 (collecting cases that held segregation of two to ninety days does not trigger due process concerns

and stating, "In a number of other cases, we have explained that a liberty interest may arise if the length of segregated confinement is substantial *and* the record reveals that the conditions of confinement are unusually harsh.") (emphasis added); *Lekas*, 405 F.3d at 612 (finding that up to ninety days in segregation does not affect liberty); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component that plays a part in determining whether a liberty interest exists). Once an inmate shows a particular placement implicates a liberty interest, he has a right to a meaningful review, which periodically "evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted.'" *Isby*, 856 F.3d at 527 (quoting *Toevs v. Reid,* 685 F.3d 903, 913-14 (10th Cir. 2012)).[1]

Here, Noojin claims his rights have been violated because he was reclassified as a threat/safety issue to the general population at MCF and was placed in ARSH on November 21, 2023. As such, he must show the combination of the length in segregation plus the conditions there violated the Constitution before any process was due. Noojin's amended complaint was filed almost a year-and-a-half after his initial classification, and—while the contours of the specific conditions have shifted as will be discussed

---

[1] Of note, "for any term of solitary confinement lasting more than days but less than years, qualified immunity will often apply to claims for damages. For segregation terms measured in months, even if an inmate's segregation amounted to a deprivation of a liberty interest, it is unlikely that prison officials could be held responsible for incorrectly guessing otherwise due to the ambiguity of the parameters of the law." *Jackson*, 150 F.4th at 858–59 (internal citation and quotation marks omitted). However, because qualified immunity is an affirmative defense, this question is best left to a later stage of the litigation.

below—he claims he has been in ARSH the entire time to the present day. *See* ECF 16-1; *see also* ECF 20. The Seventh Circuit has "not yet affirmatively adopted any minimum duration of disciplinary segregation that automatically implicates a liberty interest, regardless of other conditions of confinement[,]" *Jackson*, 150 F.4th at 859, but cases suggest "solitary confinement of up to one year" lies close to that "outer limit under current law." *Id*. at 860. Thus, when analyzing Noojin's allegations regarding the conditions he was subjected to, the court has been cognizant of the Seventh Circuit's emphasis that "the significance of unusually appalling physical conditions diminishes when courts confront prolonged terms of segregation." *Id*. at 859.

Noojin describes the overall conditions in ARSH as follows: (1) he wasn't given a blanket during the cold winter months, (2) he has been denied recreation including a stint of up to five months when he was placed in complete 24-hour solitary confinement with no human interaction or physical exercise outside his cell, (3) prisoners throw feces which leaves an unclean smell, (4) he hasn't been allowed to shave or get a haircut, (5) he isn't allowed to order many items from commissary, (6) his food is cold, unappetizing, and his meals lack Kool-Aid, (7) he is only given cleaning supplies sporadically, and (8) he hasn't been able to keep a religious necklace in his cell. These allegations don't rise to the level of "unequivocally 'disgusting'" as described in other cases and can be distinguished as mainly being "restrictive." *Id*. at 860–61 (citing *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015). However, the length of time Noojin has been subjected to the harsher restrictive conditions tips the balance in his favor—at least during this early screening stage—and suggests his particular placement may implicate

a liberty interest. Construing the complaint generously, it may be inferred Noojin is alleging he has failed to receive any reviews or process whatsoever since he has been in ARSH. It may also be inferred that Warden English and Deputy Warden Smith were directly and repeatedly advised of Noojin's issues, had the authority/ability to provide him with the process he was due, yet did nothing about it. Giving Noojin the benefit of the inferences to which he is entitled at this stage of the litigation, the court will allow him to proceed against these defendants for violating his Fourteenth Amendment due process rights. *See Isby*, 856 F.3d at 527 (if placement implicates a liberty interest, inmate has a right to meaningful review which periodically "evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted."); *see also Jackson*, 150 F.4th at 860–61 (noting that segregation periods of a year approach the "outer limit" of the Seventh Circuit's current due process caselaw and that "[l]ong terms of solitary confinement are not necessarily unconstitutional, at least not yet. But they call for at least some due process protections that apply when prison discipline deprives a prisoner of a liberty interest").

With regard to the other defendants, however, Noojin hasn't stated a plausible Fourteenth Amendment Claim. He doesn't plausibly suggest John Zillner, the CEO of Aramark, Ms. Montez, the food service supervisor, or Major Bennett, whose job responsibilities are undefined, had any role in the placement or retention of Noojin in ARSH or whether Noojin was provided with meaningful review. *See Moderson v. City of Neenah*, 137 F.4th 611, 617 (7th Cir. 2025) ("A defendant cannot be held liable for a

constitutional violation if she did not cause or participate in the alleged violation.") (citation omitted)); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (There is no general respondeat superior liability under 42 U.S.C. § 1983.). And, while he faults Grievance Specialist Gapski for failing to process his grievances in a timely or proper manner, this isn't sufficient to state a constitutional claim against him either. *See Grieveson v. Anderson*, 538 F.3d 763, 770 (7th Cir. 2008) (noting there is not a Fourteenth Amendment substantive due process right to an inmate grievance procedure); *see also Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (observing that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *Conner v. Hoem*, 768 Fed. Appx. 560, 564 (7th Cir. 2019) ("In any case, the Constitution does not require state actors to enforce their own policies and regulations.") (citing *Garcia v. Kankakee Cty. Hous. Auth.*, 279 F.3d 532, 535 (7th Cir. 2002)).

<u>*Eighth Amendment - Conditions of Confinement*</u>

The court must also consider whether the conditions of Noojin's confinement violated the Eighth Amendment.[2] The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend*, 522 F.3d at 773 (citations omitted). An officer can violate the Constitution if he

---

[2] *See Townsend*, 522 F.3d at 772-73 ("The issue of cell conditions in TLU is best analyzed as a claim brought under the Eighth Amendment.").

or she exhibits deliberate indifference to hazardous conditions that may seriously harm an inmate. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). Deliberate indifference encompasses both objective and subjective components:

> A prisoner challenging conditions of confinement must first show that the conditions were sufficiently serious as an objective matter, meaning that they denied the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety. Second, in covering the subjective component of the inquiry, the inmate must prove that prison officials acted with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the inmate.

*Thomas*, 2 F.4th at 719–20 (internal quotation marks, citations, and brackets omitted). Put another way, an inmate can state a viable claim for deliberate indifference if he alleges the defendant "deliberately ignored a prison condition that presented an objectively, sufficiently serious risk of harm." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citation omitted).

"Generally speaking, challenges to conditions of confinement cannot be aggregated and considered in combination unless 'they have a mutually enforcing effect that produces the deprivation of a single, identifiable need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.'" *Johnson v. Prentice,* 29 F.4th 895, 904 (7th Cir. 2022) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). Allegations of vague "overall conditions" aren't sufficient. *Id.* Regarding state of mind, "[d]eliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford*

8

*Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). "Negligence, or even objective recklessness, is insufficient to satisfy deliberate indifference." *Stockton*, 44 F.4th at 615.

I.      *Shower/Holding Cell*

When Noojin was transferred to ARSH on November 21, 2023, he was initially held in a dirty shower without a toilet, chair, or drinking water for "many hours." ECF 16-1 at 3. He doesn't say who put him in the shower, nor does he explain exactly how long he was held there, but it may be inferred it was for hours rather than days.[3] Because there was no toilet, he was forced to urinate in the drain. While unpleasant, this short-term deprivation isn't the type that rises to the level of a constitutional violation. *See, e.g., Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) ("[T]he duration of the condition . . . determines whether the conditions of confinement are unconstitutional."); *White v. Knight*, 710 Fed. Appx. 260, 261–62 (7th Cir. 2018) (affirming dismissal of complaint where prison policy limited access to toilets during lockdowns, which caused plaintiff to defecate once on his cell floor and another time in a bag after a guard refused to let him use a toilet and told him to "[defecate] on himself" because "long-term deprivations of modern toilet facilities" can potentially violate the Eighth Amendment, but "temporary imposition[s]"do not). Moreover, while Noojin claims he wrote grievances and letters about the matter after the fact, he doesn't plausibly allege he told

---

[3] Indeed, he admits he was moved to a regular cell on the same day. *See* ECF 16-1 at 5.

anyone—much less any of the defendants—about his temporary lack of water and a toilet while it was occurring, so they can't be held personally liable even if there was a constitutional violation. *See Moderson*, 137 F.4th at 617 ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation.").[4] These allegations fail to state any plausible claims.

## II.   Lack of a Blanket

Next, Noojin complains that his mattress and blanket were stolen during his move/reclassification to ARSH. While he was given a new mattress almost immediately by Sgt. Owens, he was not given a blanket or sheet for several months during the cold winter. He asked "all staff who walked [by] for a blanket" because it was cold. ECF 16-1 at 5. He filled out a single grievance the day after he was placed in ARSH, but it wasn't answered for approximately five months. Grievance Specialist Michael Gapski apologized for not responding sooner, but by then the weather was warmer. Noojin claims an unnamed "supervisor (Lieutenant)" is responsible for "issu[ing] me all my clothing and bedding essentials," but due to "incompetence and deliberate indifference" he suffered in the cold. *Id*. He blames Warden English, Deputy Warden Smith, Major Bennett, and Grievance Specialist Gapski because "it is all staff members

---

[4] Noojin claims it is the "practice" of Warden English and Major Bennett to use dirty showers as holding cells, but he only describes one incident. This isn't sufficient to state a *Monell* claim. *See Sanders v. Moss*, 153 F.4th 557, 570 (7th Cir. 2025) ("[W]hile a plaintiff may be able to demonstrate the existence of an official policy or custom by presenting evidence limited to his own experience, one incident cannot plausibly be described as so persistent and widespread as to practically have the force of law.") (internal quotation marks and citations omitted).

jobs, custody and supervisors to know all the policies and procedures" with regard to bedding. *Id.* at 6.

The Seventh Circuit has found that "a low cell temperature at night combined with a failure to issue blankets" can violate the Eighth Amendment. *Johnson*, 29 F.4th at 904. However, Noojin hasn't named a defendant responsible for the deprivation—instead he faults the defendants generally in their supervisory capacities—so he has failed to plead a sufficient claim. *See Moderson*, 137 F.4th at 617 ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation.") (citation omitted)); *Aguilar*, 861 F.3d at 633 ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks*, 555 F.3d at 594 (no general respondeat superior liability under 42 U.S.C. § 1983); *Grieveson*, 538 F.3d at 770 (no constitutional right to an inmate grievance procedure); *see also Scott*, 346 F.3d at 760 ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *Conner*, 768 Fed. Appx. at 564 ("Constitution does not require state actors to enforce their own policies and regulations."). These allegations fail to state any plausible claims.

### III.    *Lack of a Cup and Spork*

Noojin complains that his orange cup and spork weren't inventoried properly the day he was transferred to his new cell. He tried to tell "all staff who walked the unit" about it, but they ignored him. ECF 16-1 at 7. He then specifically told Counselor Murphy, who informed him he would need to purchase new ones off commissary. In the meantime, Noojin could only drink water from the sink (as opposed to Kool-Aid

from the cup) and had to eat his food with a piece of Styrofoam ripped from his tray. He bought new ones for $0.78 and $0.23 on December 11, 2023, and received them about two weeks later. Noojin claims that the grievance process was essentially unavailable and that he was treated unfairly because others on his unit had sporks and cups. He claims he "lost calories" during this time because his eating ability was hindered by the lack of spork and because he couldn't drink the Kool-Aid. *Id*. at 8.

Conditions that merely cause temporary inconveniences and discomfort or make confinement unpleasant do not rise to the level of constitutional violations. *Adams v. Pate*, 445 F.2d 105, 108-109 (7th Cir. 1971); *see also Lunsford v. Bennett,* 17 F.3d 1574, 1581 (7th Cir. 1994) ("The Constitution does not require prison officials to provide the equivalent of hotel accommodations or even comfortable prisons.") (internal quotation omitted). Noojin's allegation that he didn't have a cup and spork for a little over a month isn't sufficiently serious to constitute an Eighth Amendment violation, especially considering he admits he was able to drink water from the sink and scoop his food with Styrofoam. *See Stanley v. Page*, 44 Fed. Appx. 13, 15 (7th Cir. 2002) ("eating unappetizing food with one's hands . . . do[es] not jeopardize health or safety"); *see also Martin v. Lane*, 766 F. Supp. 641, 648 (N.D. Ill. 1991) (temporary "lack of eating utensils in the institution" didn't create the type of "intolerable or shocking prison conditions" necessary to constitute a violation of the Eighth Amendment). Furthermore, while Noojin claims he "lost calories" during the few weeks he was without a cup and spork, it's unclear why. He doesn't plausibly suggest that either the lack of utensils for eating or the lack of a cup for Kool-Aid harmed his health. And, even if he had, he doesn't

allege that any of the defendants knew about or denied him medical care related to that health concern. *See, e.g., Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (finding that while a prison may not let an inmate starve to death, even a forty-five pound weight loss due to self-inflicted skipping of meals was not unconstitutional because there was "no indication that his life or health was jeopardized" or evidence that the defendants "knew that he was endangering his health sufficiently to require drastic intervention"); *see also Morris v. Kingston*, 368 F. Appx. 686, 689 (7th Cir. 2010) (finding that missing seventeen meals over twenty-three days did not violate the Constitution because plaintiff "ha[d] not shown that missing his meals … caused serious harm or lasting detriment."). These allegations don't state any plausible claims.

IV.    *Lack of Recreation/Isolation*

Noojin further alleges that he has been denied recreation while in ARSH. He claims he did not receive "any form of recreation whatsoever" from November 21, 2023, to March 2024 because MCF only offers outdoor recreation, and it was deemed too cold to go outside. ECF 16-1 at 9. He describes this five months as "complete 24 hour solitary confinement." *Id*. From March 2024 through December 2024 he received approximately two hours or recreation a week. Then, from December 2025 through March 2025, he was only offered recreation seven times and was on "complete 24 hour solitary confinement 90 of those days" with "no human interaction, no air, no sun, no physical exercise outside my cell." *Id*. at 10. Noojin says the other prisoners in ARSH start fires and throw feces and that it isn't "cleaned properly" and has an "unclean smell." *Id*. at 9. Noojin states, "So yes – an opportunity to fill my lungs with fresh air and say hello to the snow

13

and sky was something I begged for mentally. Stretching my muscles and do what little physical exercise my hernia permitted would also of (sic) been very welcomed in my life." *Id.* at 9–10. He filed grievances about the matter and wrote directly to his counselors, different lieutenants assigned to the unit, the unit team manager, Major Bennett, Deputy Warden Smith, and Warden Brian English "many times to no avail." *Id.* at 11.

"[A]ccess to exercise is an essential human need . . .." *Sanders v. Moss*, 153 F.4th 557, 569 (7th Cir. 2025). "Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). Likewise, "long stretches of [solitary] confinement can have serious adverse effects on prisoners' psychological well-being" and can be considered cruel under the Eighth Amendment if "unrelieved by opportunities for out-of-cell exercise." *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001). That said, the Seventh Circuit has determined that "a 90-day denial of yard privileges for serious misconduct by an inmate in segregation is not cruel and unusual punishment, nor is it an Eighth Amendment violation to stack such penalties unless the inmate's misconduct was so minor as to be trivial[.]" *Johnson*, 29 F.4th at 902 (internal quotation marks and citations omitted) (finding three-year aggregate denial of yard privileges was not unconstitutional); *see also Pearson v. Ramos*, 237 F.3d 881, 885 (7th Cir. 2001) (combined year-long denial of yard privileges did not violate the Constitution because "[p]reventing access to the yard was a reasonable method of protecting the staff and the other prisoners from [prisoner's] violent

14

propensities"); *Martin v. Tyson*, 845 F.2d 1451, 1454, 1456 (7th Cir. 1988) (holding a prisoner suffers "no constitutional deprivation" from four month ban on outdoor recreation when "related to a legitimate prison concern").

Here, Noojin asserts the deprivations were due to arbitrary weather and staffing issues rather than any disciplinary, penological, or safety concerns. He claims he wrote letters to and informed Warden English, Deputy Warden Smith, and Major Bennett in-person of its effects on his physical and mental health. Giving Noojin the benefit of the inferences to which he is entitled at the pleading stage, the allegations in the complaint state plausible Eighth Amendment claims against Warden English, Deputy Warden Smith, and Major Bennett for housing him in prolonged isolation without any form of recreation or exercise.

V.    *Access to Razors, Haircuts, and Commissary Items*

Noojin claims that he has not been allowed to shave in fifteen months, which violates IDOC policy. Specifically, he states, "I have not been given a razor since November 21, 2023," and there is "no razor box on the unit even though the major is suppose[d] to inspect it daily." ECF 16-1 at 13. Noojin says the fact that he hasn't been allowed to shave or cut his hair for five months "gives me severe mental anguish." *Id*. Noojin also complains because he is not allowed to order certain items from commissary while on ARSH. Specifically, he isn't able to order greeting cards, a cocoa butter stick, a toothbrush holder, dental floss loops, calcium tablets, fiber capsules, a soap dish, or reading glasses. He classifies these as "needed hygiene" items and claims that the Warden has deprived him of them despite the fact that they are allowed at in

15

RHU and at other IDOC facilities. *Id.* at 15. He filed a grievance about the lack of commissary items and wrote/spoke to his case work manager, the unit team manager, Major Bennett, Deputy Warden Smith, and Warden English. They failed to assist him.

The Eighth Amendment protects against conditions that deny inmates "the minimal civilized measure of life's necessities." *Townsend*, 522 F.3d at 773 (citations omitted). However, "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . .." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (finding that a failure to provide inmate with toilet paper, soap, toothpaste, or a toothbrush for ten days did not violate the Eighth Amendment because he suffered "considerable unpleasantness" but no "physical harm"). While the deprivation of basic hygiene items—*e.g.,* those necessary to prevent future medical issues or other harm—has been found unconstitutional, a mere lack of personal grooming or cosmetic items has not. *See, e.g., Conner v. Hoem*, 768 Fed. Appx. 560, 564 (7th Cir. 2019) (highlighting the difference between a lack of items that merely made conditions "unpleasant" versus those that effectively denied the plaintiff of "basic human needs").

Here, Noojin claims he hasn't received a haircut in many months and isn't allowed a razor to shave, but there is no free-standing constitutional right to either. He doesn't plausibly allege he has developed any sort of medical issue due to the lack of grooming, nor does he suggest that his hair preferences are related to any sort of religious practice. *See e.g., Owens v. Allen*, No. 14-CV-00055-JPG, 2014 WL 562655, at *7 (S.D. Ill. Feb. 13, 2014), *aff'd sub nom. Owens v. Funk*, 760 Fed. Appx. 439 (7th Cir. 2019) (finding the denial of haircuts didn't violate the Constitution because there isn't a

constitutional right to have "freedom from the routine deprivations and discomforts of prison life" nor is the failure to follow prison policy or administrative regulations a constitutional claim); *Scroggins v. Madison Cnty. Jail*, No. 14-CV-701-MJR, 2014 WL 3229304, at *4 (S.D. Ill. July 8, 2014) ("There is no constitutional right to regular haircuts in jail, and an inmate's right to possess a personal razor may be justifiably limited due to security or other concerns."); *see also Wadsworth v. Hyatte*, No. 3:22-CV-417-JD-JEM, 2023 WL 1965044, at *1 (N.D. Ind. Feb. 13, 2023) (denial of ability to shave doesn't violate the Eighth Amendment unless officials were deliberately indifferent to a serious medical need associated with it).

The lack of non-essential commissary items like greeting cards, a cocoa butter stick, a toothbrush holder, dental floss loops, calcium tablets, fiber capsules, and a soap dish doesn't violate the Eighth Amendment either. While Noojin laments the lack of a toothbrush *holder*, dental floss *loops*, and a soap *dish*, he doesn't allege he has been denied a toothbrush, toothpaste, or soap. *See Conner*, 768 Fed. Appx. at 564 (finding "inadequate" amount of soap, lack of towel, and no lotion made showering "unpleasant" but not unconstitutional; dental wipes were provided as alternative to a toothbrush and toothpaste, so the case was distinguishable from those that involved a "long-term denial of *all* oral-hygiene products") (emphasis added). Noojin doesn't plausibly allege that a cocoa butter stick,[5] calcium tablets, or fiber capsules are

---

[5] Noojin alleges he needs the cocoa butter stick for his "dry cracked skin that bleeds when I itch it," but he doesn't plausibly allege that he has been diagnosed with a medical condition that requires it or suggest that any of the named defendants knew about his skin issues yet refused to act. ECF 16-1 at 14.

medically necessary or otherwise essential to comport with decency or a basic human need. *See Conner*, 768 Fed. Appx. at 563–64 (deprivation of in-cell medicated lotion which resulted in dry, itchy skin was "unpleasant" but not unconstitutional, especially considering medical staff offered scheduled lotion applications). The allegations regarding these commissary items don't state any plausible Eighth Amendment claims.

However, the allegations regarding the reading glasses present a closer call. Noojin claims Warden English has not allowed him to order reading glasses from commissary for over a year because they are prohibited in ARSH. Noojin claims he developed "histoplasmosis" in his left eye several years ago, and after "thirteen injections of chemotherapy in my eye (left) my vision was saved." ECF 16-1 at 15. That said, Noojin claims he is no longer able to read without glasses after the treatment, which he describes as cruel and unusual punishment considering "more often than not [he is] on 24 hour solitary confinement." *Id*. at 16. He wrote to and spoke with Warden English, Deputy Warden Smith, and Major Bennett directly as well as Heather Claxton, the head of commissary—who deferred to Warden English—but they refused to assist him in obtaining the reading glasses. "A need for *prescription* glasses to avoid double vision and the loss of depth perception has been determined to be 'serious' and inconsistent with 'contemporary standards of decency.'" *Alexander v. Richter*, 756 Fed. Appx. 611, 614 (7th Cir. 2018) (emphasis added)); *see also Franklin v. McCaughtry*, 110 Fed. Appx. 715, 721 (7th Cir. 2004) ("need for *prescription* glasses could conceivably constitute a serious medical need") (emphasis added)); *but see Conway v. Wexford Health Sources, Inc.*, No. 3:17-CV-110-MAB, 2020 WL 1433830, at *4 (S.D. Ill. Mar. 24, 2020)

(collecting cases and noting that "district courts in this Circuit and others have routinely held that the need for *reading* glasses is not a serious medical need, even if reading without glasses causes headaches") (emphasis added)). Noojin doesn't allege the reading glasses were medically prescribed, but he *has* described a serious medical condition that allegedly made it impossible for him to read without them. Although he will need to prove the reading glasses were both objectively necessary and that the defendants were deliberately indifferent to that need, *see Thomas*, 2 F.4th at 719–20, giving Noojin the benefit of the inferences to which he is entitled at the pleading stage, he has stated plausible Eighth Amendment claims against Warden English, Deputy Warden Smith, and Major Bennett for depriving him of glasses necessary to read and function while in ARSH.

   VI.    *Food Service Issues*

Noojin also complains about the food service on ARSH. He believes the basic needs of prisoners are not being met by Aramark Food Service Corporation, which is "run by CEO John Zillmer" and the Ms. Montez who is the "highest ranking supervisor" at MCF. ECF 16-1 at 17. He further claims Deputy Warden Smith is the "contract manager" at MCF for Aramark. *Id*. According to Noojin, policy and IDOC standards demand that Aramark provide "effective delivery of food service." *Id*. He believes the contract between Aramark and IDOC has been breached. Specifically, Noojin complains:

> Trays for A-cell house are made in the kitchen. Styrofoam trays are used which are disposable and are not intended to retain heat for long periods. These trays do not have enough food slots for a balanced meal. Sometimes

a sheet of wax paper is used—most times it is not. Aramark knows there is not enough food slots, so they use this wax paper as a barrier to place food items on top of the barrier (wax) bread-cake-biscuit so it's not directly in my food floating and becoming ruined. Most of the time the wax is not used and my cake is placed in my vegetables. The cake soaks up the water and is ruined. This is done with bread-biscuits-and cornbread too. . . . When salt and pepper is placed in my tray and the kitchen has Kool-Aid packs—these three items are placed in a sandwich bags and packed wherever they land on the tray. However, Kool-Aid is missing most of the time. . . . When the kitchen decides not to put Kool-Aid in the tray; they do not even bother with salt and pepper even though this violates the contract. Other times Kool-Aid is placed in the tray only, and again salt and pepper is not used. I make a big deal about the Kool-Aid because these are calories used to achieve a daily calorie count. Kool-Aid is missing so much the calorie loss is significant. Salt and pepper is never provided at breakfast. . . . I have never been provided with a napkin although I am suppose[d] to get one every meal. The food is not palatable, which is why salt and pepper are provided. Kool-Aid is also on the menu, when it is missing a breach of contract occurs.

*Id*. at 18–19. Noojin claims that "using Styrofoam trays violates the practices and procedures agreed upon between the Indiana Dept. of Corrections and Aramark when the contract was formed. *Id*. at 20. He also complains about the food delivery methods—which are allegedly unsanitary because of the use of the Styrofoam trays and rusty metal carts. He complains that "dirty apples and bananas" are placed on the trays rather than being distributed separately. *Id*. at 21. Noojin states he has "lost 25 lbs because of this cold unsanitary food." *Id*. at 21. Although he tries to eat it, the food is "to[o] cold" and has "begun to make my stomach hurt [and] give me diarrhea stomach cramps." *Id*. He has sent grievances to Ms. Montez and "told every single officer who works this unit" as well as Major Bennett, Deputy Warden Smith, and Warden English. *Id*. He also sent a letter to John Zillmer, the CEO of Aramark.

Noojin put in a healthcare request regarding his stomach issues and admits that he was seen by a doctor who put him on a "high protein diet 3 times a day." *Id.* at 22. In addition to the normal cold breakfast and lunch trays, he admits he gets an "extra peanut butter pack and four pieces of bread at night with my sack dinner (which [he claims] is not enough calories and nutrition for an adult meal), but unwashed dirty apples are placed on the bread making all of it unsanitary." *Id.* He claims his rights have been violated because prisoners able to eat in the "chow hall here get hot meals." *Id.* He claims he sent all of the defendants requests, letters, and grievances but was ignored.

Prisoners must be given "[a]dequate food" to comport with the "minimal civilized measure of life's necessities[.]" *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 670 (7th Cir. 2012) (collecting cases). That said, "complaints about cold and poorly-prepared food" are insufficient to state a claim. *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994); *see also Reed v. McBride,* 178 F.3d 849, 853–54 (7th Cir. 1999) (explaining that extent, duration, and consequences are relevant in assessing whether deprivation of food violates Eighth Amendment). Here, Noojin doesn't allege that he has been deprived of any meals; rather, he complains about the preparation and quality of the food. Noojin claims his bread, cake, and/or biscuits are often soggy because they soak up liquid from the other items in the tray and that the food is cold and unpalatable (which is made worse by the lack of salt and pepper). However, prisoners do not have a right to "food that is tasty or even appetizing," *Williams v. Berge*, 102 Fed. Appx. 506, 507

21

(7th Cir. 2004), so these allegations don't state a claim.[6] Noojin does allege that his Kool-Aid packets are often missing which deprives him of calories and has allegedly led to a twenty-five pound weight loss over the course of a year-and-a-half, but—even if the lack of Kool-Aid could plausibly suggest a health risk—he admits that he was put on a high-protein diet once he submitted a healthcare request about the matter.[7] He doesn't plausibly allege the defendants knew about his weight loss or, more importantly, ignored or otherwise interfered with his medical requests once he made them to the proper medical professionals. *See id.* (claim of "inedible food" due to moldy raisins and rancid peanut butter was properly dismissed because there was no "suggestion in [plaintiff's] complaint that prison officials served stale food with the subjective intent to cause harm"); *see also Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (inmate complained he received less food and calories than food program was designed to provide, but "[b]ecause the Warden and Director did not know that the inmates were being deprived of adequate nutrition and were not personally involved in delivering the purportedly deficient meals, they may not be held liable under section 1983"); *Aguilar*, 861 F.3d at 633 ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Freeman*, 441 F.3d at 547 (forty-five pound weight loss due

---

[6] He also asserts the food is unsanitary, but the only facts he provides in support of this assertion are that unwashed apples, bananas, and condiment packets are sometimes placed on top of other food items and that the Styrofoam food trays are stacked on rusty carts, which he speculates causes the food to be covered in bacteria. Noojin's speculation isn't sufficient to state a plausible claim.

[7] It can't be reasonably inferred that the missing Kool-Aid packet(s) consisted of more calories/nutrition than the "extra peanut butter pack and four pieces of bread" he was prescribed by medical.

to self-inflicted skipping of meals was not unconstitutional because there was "no indication that his life or health was jeopardized" or evidence that the defendants "knew that he was endangering his health sufficiently to require drastic intervention"). These allegations don't state any plausible claims.[8]

## VII.    Cleaning Supplies

Noojin complains that he hasn't been given a toilet brush in fifteen months, but he admits he is "offered cell cleaning sporadically." ECF 16-1 at 23. He believes this violated his rights because prison policy directives say he should he able to clean his cell daily. "Sometimes months have gone by without cell cleaning, other times weeks." *Id*. He has been offered a broom, but he doesn't want to use it because it's also used to clean the shower. He has "taken to sweeping the floor with my hands" instead. *Id*. The mop water they give him is dirty by the time it gets to his cell. He isn't given a rag to clean anything in his cell, and the vents are "full of dust." *Id*. at 24. He claims that the trash is "almost never collected." *Id*. He states, "The dorm is never cleaned properly, it is swept sporadically. It is never mopped. The walls are never wiped or washed. The cell doors or food trap never wiped with germicide. There is dust and debris everywhere. The showers are not cleaned daily even though they are used daily." *Id*. Major Bennet told Noojin the showers would be power washed in March of 2025, but

---

[8] To the extent Noojin is complaining about prison food procedures in general and/or an alleged breach of contract between Aramark and IDOC, these claims fail as well. *See Scott*, 346 F.3d at 760 ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations"); *Conner*, 768 Fed. Appx. at 564 ("In any case, the Constitution does not require state actors to enforce their own policies and regulations.").

that hasn't been done. Noojin speculates that there is "bacteria everywhere." *Id*. at 25.

He claims, "Dust in the cells and vents makes me sneeze, and my eyes water, germs are

everywhere." *Id*. He believes Major Bennet, Deputy Warden Smith, Warden English,

and Grievance Specialist Gapski are responsible for the conditions.

The Seventh Circuit has "recognized Eighth Amendment violations where

prisoners are deprived of cleaning supplies and running water *only in extreme*

*circumstances*." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (emphasis added); *see*

*also Wheeler v. Walker*, 303 Fed. Appx. 365, 368 (7th Cir. 2008) (finding plausible Eighth

Amendment claim where inmate alleged prison officials "ignored his requests for basic

cleaning supplies while he was exposed to a combination of a heavy roach-infestation,

filth, and human waste"). In *Gray*, the plaintiff complained of "disgusting conditions"

including an "infestation of vermin, insects, and birds" in his cell. *Gray,* 826 F.3d at 1003.

The Seventh Circuit allowed him to proceed because the "myriad infestations and his

lack of access to adequate cleaning supplies, taken together, deprived him of the basic

human need of rudimentary sanitation in violation of the Eighth Amendment." *Id*. at

1005. Here, Noojin hasn't described an objectively serious uncleanliness issue sufficient

to trigger a constitutional violation. He claims the vents are dusty, the showers are

dirty, the walls aren't properly wiped, and there are germs everywhere. This has

allegedly caused him to sneeze and his eyes to water. However, he admits his cell is

cleaned periodically and he has been offered a broom and a mop. While he has chosen

not to utilize these supplies because they are allegedly dirty, he admits he has a sink in

his cell with running water.[9] *See Myrick v. Anglin*, 496 Fed. Appx. 670, 676 (7th Cir. 2012)

("Although he did not receive the specific cleaning supplies he requested, [plaintiff]

does not allege that he was unable to clean his cell with supplies available to him."); *see*

*also Moore-Bey v. Cohn*, 69 Fed. Appx. 784, 788 (7th Cir. 2003) (plaintiff's Eighth

Amendment claim that he was denied cleaning supplies failed because he didn't allege

his cell was "unusually dirty" or unhealthy). Because the Eighth Amendment doesn't

require specific cleaning supplies to be provided on a particular schedule—and because

Noojin hasn't described unsanitary conditions that rise to the level of a constitutional

violation—these allegations don't state any plausible claims.


*First Amendment Claims*

    I.    *Retaliation*

Noojin claims Major Bennett had the "entire dorm shook down" on September 9,

2024, in retaliation for the fact that he filed grievances about the conditions of ARSH.

ECF 16-1 at 26. He claims "all" of his personal property and clothing items were

confiscated as punishment for his complaints. *Id*. He was left with two boxer shorts, two

pairs of socks, and two t-shirts, when IDOC policy states he should have three of each.

He claims this is a hardship because laundry is done "sporadically" at best. *Id*. He

asserts that none of the items taken "threatened the safety and security of the prison,"

so it could only have been done for punitive purposes. *Id*. at 27.

---

[9] It may also be inferred he has soap, since he complains about the lack of a soap dish but not soap itself.

Under the First Amendment, an inmate can't be punished for engaging in certain kinds of speech. "To establish a prima facie case of unlawful retaliation, a plaintiff must show (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (internal quotation marks and citation omitted). Filing grievances is a protected activity, the confiscation of all personal items could potentially deter future complaints, and Noojin has alleged that Major Bennett had the cell shaken down as punishment for the grievances filed against him. Giving Noojin the benefit of the inferences he is entitled to at this stage, he has stated a plausible First Amendment retaliation claim against Major Bennett.

I.    *Religious Necklace*

On January 21, 2024, Noojin wrote to the Chaplain to ask about the procedures for receiving a "religious necklace." ECF 16-1 at He was told it "could not be sold on commissary or exceed $35.00." *Id*. He was sent a necklace, but it was confiscated. He ordered a different one off commissary for $14.00, but that too was taken. Noojin believes this was "censoring" his religious practices. He wrote the Warden and others, but they didn't respond. He claims, "My freedom to practice religion rights (First Amendment are being violated)," while other prisoners are allowed to wear their pendants. *Id*. at 28.

"The Free Exercise Clause [of the First Amendment] prohibits the state from imposing a substantial burden on a central religious belief or practice." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (internal citation and quotation marks omitted). "A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379-80 (7th Cir. 2016) (brackets, internal quotation marks, and citation omitted).[10] Nevertheless, correctional officials may restrict the exercise of religion if the restrictions are reasonably related to legitimate penological objectives, which include safety, security, and economic concerns. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). Additionally, the Supreme Court has long established "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

Noojin doesn't plausibly allege any of the named defendants were involved in depriving him of a religious necklace. He refers to the Chaplain and the mailroom staff, but he hasn't sued them. He alleges he wrote to Warden English about the matter, but that isn't sufficient to state a claim. *See Moderson*, 137 F.4th at 617 ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation.") (citation omitted)); *Aguilar*, 861 F.3d at 633 ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks*, 555 F.3d at

---

[10] "De minimis burdens" on the free exercise of religion are not actionable. *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999).

594 (There is no general respondeat superior liability under 42 U.S.C. § 1983.).

Moreover, Noojin doesn't explain what religion he practices, if and why the necklace is

central to his religious beliefs, and whether he had other options for exercising his

religion without the necklace. A complaint must contain sufficient factual matter "to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also*

*Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (claim must be

plausible on its face and complaint must provide adequate factual content). These

allegations fail to state any claims.

### Fourteenth Amendment - Equal Protection

Finally, Noojin sprinkles the phrase equal protection throughout his complaint.

Although it's not entirely clear, it appears that he is attempting to bring claims based on

his status as a group member in ARSH as well as various class-of-one claims. "Equal

protection of the laws means that all persons similarly situated should be treated alike."

*Ruiz v. Pritzker*, 162 F.4th 886, 890 (7th Cir. 2025) (quoting *U.S. v. Nagel*, 559 F.3d 756, 760

(7th Cir. 2009)). When a claim doesn't involve a suspect class or a fundamental right, the

standard applied is a rational-basis review. *Id*. (citing *Ostrowski v. Lake County*, 33 F.4th

960, 966 (7th Cir. 2022)). To state a claim under that standard, a plaintiff must allege

there isn't a rational relationship between the complained of treatment and "any

conceivably legitimate government purpose." *Id*. (citing *Srail v. Vill. of Lisle*, 588 F.3d

940, 948 (7th Cir. 2009)). At the pleading stage, he needs to "alleg[e] facts sufficient to

overcome the presumption of rationality that applies to government classifications." *Id*. (quoting *Flying J Inc. v. City of New Haven,* 549 F.3d 538, 546 (7th Cir. 2008)).

Similarly, a "classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless [individual].'" *Frederickson v. Landeros*, 943 F.3d 1054, 1060 (7th Cir. 2019) (quoting *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013)). "Class-of-one claimants carry a heavy burden" and must, at the very least, show he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588 (7th Cir. 2021); *see also Walker v. Samuels*, 543 F. App'x 610, 611 (7th Cir. 2013) ("But even at the pleading stage, a plaintiff must anticipate the burden of eliminating any reasonably conceivable state of facts that could provide a rational basis for the government's actions [and] must provide a sufficiently plausible basis to overcome the applicable presumption of rationality.") (internal quotation marks and citations omitted)).

Noojin claims the group of prisoners being held in ARSH at MCF are subjected to different treatment than those in both the general population and the disciplinary segregation/restricted housing unit (RHU) at MCF as well as those in segregation at various other IDOC facilities. Specifically, non-ARSH prisoners are allegedly given the following: more recreation time (both inside and out), razors to shave, regular haircuts, additional access to commissary items, more appetizing and better-prepared food, and more cleaning supplies. But Noojin has failed to articulate sufficient facts to overcome

the presumption of rationality and deference given to prison officials in managing the day-to-day operations of their facilities. *See, e.g.*, *Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) (prison administrators must be given "operational flexibility" as their particular prison's needs dictate); *see also Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020) (correctional officials must be deferred to, especially in matters "implicating safety and security concerns"). Noojin doesn't plausibly suggest that the physical layouts, staffing requirements, and/or types of inmates are substantially the same from IDOC facility-to-facility or even from housing unit-to-housing unit such that the differences in conditions could be presumed irrational. For example, ratios of guards to prisoners as well as the cells and physical layout of the units are likely different in RHU versus ARSH. Likewise, the classification levels of prisoners in ARSH as opposed to the general population of MCF are undoubtedly dissimilar in an overall security sense. In any event, Noojin hasn't described the similarities/differences in any meaningful way. *See Ruiz*, 162 F.4th at 892 (affirming dismissal of equal protection claim because plaintiff "failed to allege facts sufficient to overcome the strong presumption of rationality to which the [government classification] is entitled"); *Griffin v. Carter*, No. 23-1462, 2023 WL 4946734, at *1–2 (7th Cir. Aug. 3, 2023) (plaintiff alleged that inmates in administrative segregation "could not order food from the commissary and could obtain only limited sanitation and cleaning supplies, clothing, and bedding" even though they were "one and the same" as those in the general population; however, dismissal at the screening stage was affirmed because plaintiff did not "carr[y] his

30

burden to demonstrate that officials exceeded that discretion and adopted an irrational policy").

To the extent Noojin is attempting to assert class-of-one equal protection claims related to the denial or confiscation of his specific items—*e.g.*, a blanket, his cup and spork, personal items, and his religious necklaces—[11] such claims fail because he hasn't plausibly alleged any of the named defendants intentionally denied him the items and did so without any conceivable rational basis. *See Lee v. Stanford*, No. 24-2417, 2025 WL 1904114, at *2–3 (7th Cir. July 10, 2025) (affirming dismissal of equal protection class-of-one claim because "[a]lthough [plaintiff] peppers throughout the complaint that [defendant] acted 'intentionally,' 'arbitrarily,' and with 'no rational basis, these bare legal conclusions are irrelevant to our assessment"); *see also Bissessur*, 581 F.3d at 602 (claim must be plausible on its face and complaint must provide adequate factual content). Recall, "a state officer's alleged violation of state law [or institutional policy] alone does not give rise to a constitutional claim under the Equal Protection Clause or otherwise." *Lee*, 2025 WL 1904114, at *2. As noted by the Seventh Circuit, a class-of-one claim is typically stated by alleging that "a defendant has either a personal financial stake or some history with the plaintiff, and that this stake or history demonstrates both

---

[11] He claims he wasn't afforded equal protection because "all other offenders on, in A-cell house had two blankets" and he was "treated different (sic) than all offenders who had blankets in my similar situation." ECF 16-1 at 6. He also asserts his clothing and personal items were taken away, while those in the same type of cell "with plenty of space" were not. *Id*. at 27. He claims his religious necklace was confiscated while "other persons in my situation throughout the Indiana Dept. of Corrections are allowed to wear pendants—even at this facility." *Id*. at 28. His claims about his cup and spork are less clear. He states, "I was not treated equally to other offenders in my situation. Not as an individual or a class." *Id*. at 8.

the lack of a rational basis for the action and animus." *Lee*, 2025 WL 1904114, at *3 (quoting *Frederickson*, 943 F.3d at 1062). Noojin's assertions regarding equal protection aren't sufficient, so these allegations don't state a plausible claim either.[12]

For these reasons, the court:

(1) GRANTS the motion to amend (ECF 16);

(2) DIRECTS the clerk to separately docket ECF 16-1 as the second amended complaint;

(3) DENIES the motion for clarity (ECF 20) as unnecessary;

(4) GRANTS Branton Noojin leave to proceed against Warden Brian English and Deputy Warden of Operations Smith in their individual capacities for compensatory and punitive damages for violating the Due Process Clause of the Fourteenth Amendment by holding Noojin in administrative restrictive status housing at the Miami Correctional Facility from November 21, 2023, to the present without any meaningful review;

(5) GRANTS Branton Noojin leave to proceed against Warden Brian English, Deputy Warden of Operations Smith, and Major Robert Bennett in their individual capacities for compensatory and punitive damages for violating the Eighth Amendment

---

[12] In addition, Noojin's equal protection allegations involve "the same set of facts implicated" in his retaliation, due process, and/or Eighth Amendment claims, so it "would be redundant even if [the court] found that he stated a claim." *Williams v. Snyder*, 150 Fed. Appx. 549, 552 (7th Cir. 2005) (citing *Conyers v. Abitz*, 416 F.3d 580, 2005 WL 1713392, at *5 (7th Cir. July 25, 2005) (dismissing equal protection and Eighth Amendment claims based on same circumstances as free exercise claim because free exercise claim "gains nothing by attracting additional constitutional labels")). The court must analyze Noojin's allegations under the most "explicit source[s] of constitutional protection." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

by housing him in prolonged isolation without constitutionally adequate forms of recreation or exercise since November 21, 2023;

(6) GRANTS Branton Noojin leave to proceed against Warden Brian English, Deputy Warden of Operations Smith, and Major Robert Bennett in their individual capacities for compensatory and punitive damages for violating the Eighth Amendment by depriving him of glasses necessary to read and function while in administrative restrictive status housing since November 21, 2023;

(7) GRANTS Branton Noojin leave to proceed against Major Robert Bennett in his individual capacity for violating the First Amendment on September 9, 2024, when he allegedly confiscated all of Noojin's personal items in retaliation for filing grievances about the conditions in administrative restrictive status housing;

(8) DISMISSES all other claims;

(9) DISMISSES Grievance Specialist Michael Gapski, CEO of Aramark Food Services Corporation John Zillner, and Aramark Food Service Supervisor Ms. Montez;

(10) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Warden Brian English, Deputy Warden of Operations Smith, and Major Robert Bennett at the Indiana Department of Correction, with a copy of this order and the second amended complaint (ECF 16-1);

(11) ORDERS the Indiana Department of Correction to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

33

(12) ORDERS, under 42 U.S.C. § 1997e(g)(2), Warden Brian English, Deputy Warden of Operations Smith, and Major Robert Bennett to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on January 26, 2026

/s/Gretchen S. Lund
JUDGE
UNITED STATES DISTRICT COURT